IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 1, 2024

FILED
AUG 3 0 2024
Clerk of the Appellate Courts
REc'd By _____

**IN RE MIA C.**

Appeal from the Circuit Court for Hamilton County
No. 22A177        Michael Dumitru, Judge

No. E2023-00828-COA-R3-PT

This case involves termination of the parental rights of a biological father to his minor child. Following a bench trial, the trial court found that the statutory ground of abandonment by failure to support had been proven by clear and convincing evidence. However, the trial court declined to find that termination of the father's rights was in the child's best interest and accordingly denied the termination petition. The petitioners have appealed. Upon thorough review, we conclude that the trial court erred in its determination concerning the best interest analysis. Accordingly, we reverse the trial court's denial of the termination petition, and we grant termination of the father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court. JEFFREY USMAN, J., filed a separate concurring opinion. J. STEVEN STAFFORD, P.J., W.S., filed a separate opinion, concurring in part and dissenting in part.

Joshua H. Jenne, Cleveland, Tennessee, for the appellants, Kayla L. and Brian L.[1]

**OPINION**

I. Factual and Procedural Background

This appeal involves a petition to terminate the parental rights of the biological father, Thomas C. ("Father"), to the minor child, Mia C. ("the Child"), who was born in April 2019. The petition was filed by the Child's mother, Kayla L. ("Mother"), and stepfather, Brian L. ("Stepfather"). In August 2020, the Tennessee Department of Children's Services ("DCS") filed a petition for a temporary restraining order and

---

[1] The biological father did not file a responsive brief in this appeal.

injection against Father in the Bradley County Juvenile Court ("the juvenile court"). DCS alleged that the Child was dependent and neglected because Father had "physically abused the child and exposed her to domestic violence in the home." DCS further alleged that Father had been arrested for domestic assault against Mother in June 2020. The juvenile court entered an *ex parte* restraining order that day, directing Father to have no contact with the Child whatsoever and to remove himself from the home where the Child resided.

Instead of proceeding in the juvenile court, Mother filed a petition in the Bradley County Circuit Court ("the circuit court") to establish paternity[2] and to obtain temporary exclusive custody and an *ex parte* restraining order on August 27, 2020.[3] The same day, the circuit court entered an order granting to Mother (1) an *ex parte* restraining order against Father and (2) temporary exclusive custody of the Child.

The circuit court conducted an evidentiary hearing concerning the restraining order on September 28, 2020, wherein both parties and one additional witness testified. The circuit court entered a resultant order on October 15, 2020, determining that Father's paternity of the Child had been acknowledged and stipulated by the parties. The circuit court also specifically found that:

> Father has been repeatedly and physically abusive to []Mother and that the Father has been physically and repeatedly abusive to the parties' minor daughter. The Court furthermore has great doubts and concerns regarding Father's credibility and the Court finds most if not all of the Father's testimony to be completely not credible. The Court finds that Father is volatile and that Father takes no responsibility for his actions. The Court finds that, given the proof, there is no question about the fact that the Father has caused and there is a likelihood that Father will continue to cause substantial and irreparable harm to Mother and/or to the child and therefore Father's interaction with the Mother and child shall be and hereby are restricted and limited until further Order of the Court[.]

---

[2] Pursuant to Tennessee Code Annotated § 37-1-104(f) (West July 1, 2016, to current), "the juvenile court has concurrent jurisdiction with the circuit and chancery court of proceedings to establish the paternity of children born out of lawful wedlock and to determine any custody, visitation, support, education or other issues regarding the care and control of children born out of wedlock." A juvenile court that acquires exclusive jurisdiction, such as through the filing of a dependency and neglect action, has continuing exclusive jurisdiction until a terminating action occurs. *See* Tenn. Code Ann. § 37-1-103(c) (West April 18, 2019, to current). According to the parties, Mother voluntarily dismissed the juvenile court action so that the circuit court action could proceed.

[3] This document does not appear in the record. However, Mother testified that she did not continue prosecuting the matter in circuit court after September 2020.

- 2 -

The circuit court ordered Father to submit to a mental health evaluation.[4] It further ordered that any future co-parenting time exercised by Father would be strictly supervised by Solomon Family Solutions ("SFS") and that the restraining order would remain in place. Father was directed to "take whatever steps and action necessary to present for intake and assessment" with SFS. The order contained no similar directive for Mother.

In its attached "Bench Opinion," the circuit court made certain oral findings, which it incorporated by reference into its order. Those findings included the following:

> [Father], I got to tell you, sir, . . . almost every single thing from the start of this hearing, to the very end of this hearing, you blamed her for almost every single thing you've ever done. Wanting to get engaged is where we stopped, but we started with that. Uh, you blamed her for, for even the marijuana use and, and I, I, just a whole host of things, and, and respectfully, sir, I didn't hear you or, uh, take any personal responsibility for anything. That's a problem. 'Kay? I don't know anybody in the world who is perfect. Nobody, and starting with me, sir, but your testimony is, is way, way over the edge and, and, uh, I don't know what's caused it or what the, but, but — well, I'll leave it there. Your credibility, sir, with me is highly in question. That's where I'm at on that.

> So do I believe that there's been an abusive situation? I do. I believe it's been toward the mother. I believe it's been toward this child. Is that going to be problematic going forward with parenting time? Yes. It's going to be problematic. I think the charges and the situation here show me a bad pattern; none of which you take responsibility for. [Father], you would be far better to appear before any court, I believe, and simply say, hey, man. I got mad. She pushed my buttons. She had me over the edge, and, and I reacted improperly. That, that isn't at all what you said. You blamed every single thing you've ever done, on her. Then, I guess that's up to you, but I don't buy it.

Between October 2020 and March 2022, Father had no visitation with the Child. Upon a motion filed by Father in March 2022,[5] the circuit court entered an order on March 21, 2022, determining that Mother had not complied with its October 2020 order regarding visitation. The circuit court directed Mother to immediately complete her intake appointment with SFS and ordered that Father's visitation would continue to be supervised by SFS until the review hearing scheduled for April 2022. The circuit court further stated

---

[4] The requirement that Father complete a psychological evaluation stated only that Father was required to see "a licensed and qualified professional [of] clinical psychiatry and/or clinical psychology." The trial court did not designate a specific provider.

[5] This document does not appear in the record.

that following the review hearing, Father's wife ("Stepmother") would supervise four hours of visitation per week with the Child.

Meanwhile, on April 13, 2022, Mother and Stepfather (collectively, "Petitioners") filed a petition to terminate Father's parental rights and for simultaneous stepparent adoption in the Hamilton County Circuit Court ("trial court"). Petitioners relied upon the statutory ground of abandonment predicated upon Father's failure to financially support the Child. Petitioners further alleged that terminating Father's parental rights was in the best interest of the Child. Petitioners amended the termination petition on May 2, 2022, adding the statutory ground of severe child abuse. The trial court subsequently entered an order appointing a guardian *ad litem* for the Child.

Father filed a criminal contempt petition in the trial court on June 23, 2022, alleging that Mother had failed to comply with the circuit court's March 2022 order enforcing Father's right to supervised visitation with the Child. In July 2022, the guardian *ad litem* filed a motion requesting that the trial court define the parameters of Father's supervised visitation to avoid tension between the parties. Thereafter, on August 4, 2022, Petitioners filed a motion to suspend visitation or, in the alternative, to change the supervising facility should visitation continue. Petitioners also filed a motion seeking dismissal of Father's contempt petition.

On December 1, 2022, Father filed a motion requesting that the trial court set specific visitation guidelines for Father and Stepmother to visit with the Child, again alleging that Mother had failed to properly facilitate visits. Father lodged an answer to the termination petition on January 20, 2023, denying that he had abused or failed to support the Child. Father also raised as an affirmative defense that any failure to support was not willful. Father filed an answer to the amended petition on April 13, 2023, again denying any failure to support or severe abuse and raising the affirmative defense of lack of willfulness.

The trial court conducted a bench trial regarding the termination and contempt petitions on April 18 and 19, 2023. Mother was the first witness, providing extensive testimony regarding the volatile relationship between Father and her. Mother explained that she began dating Father in 2016 and that she quickly became pregnant but then suffered a miscarriage. The parties' relationship ended for the first time in early 2017 when Father moved to North Carolina in an attempt to rekindle a relationship with his ex-wife, who is the mother of Father's son, Elliott.

Mother and Father resumed their relationship in late 2017 or early 2018, with Father frequently staying with Mother in her parents' house. Father later returned to live in Tennessee, and in 2018, Mother and he purchased a home together from Mother's relative. Mother testified that Father did not speak to her at the beginning of her pregnancy with the Child, having moved back to his parents' home in Georgia despite knowing that Mother

- 4 -

believed herself to be pregnant. Mother continued to explain that she and Father were not on good terms during the remainder of her pregnancy, with Father vacillating between telling Mother she needed to return to her parents' residence and asking her to come back to their co-owned home. In a message to Mother dated December 6, 2018, Father stated:

> Stupid c***, you're retarded
> I hate you
> If you ever fight for custody I will bury you in the ground. I should've shot you a long time ago before I got you pregnant. [The Child] will never know you. Don't try to come for your stuff it'll be taken care of and burned for you.

In an undated audio recording, which Mother testified reflected both her voice and Father's, the following exchange occurred:

> Father: Do you want me to?
>
> Mother: What?
>
> Father: Put a bullet in your f****** brain. It won't really stay there. It will go right through. But do you want -- is that --

Mother can be heard sobbing in the audio.

Mother testified that "[a]nytime [Father] got angry, he would slap [her] in the face or push [her] down" and that he "had been physical the whole entire pregnancy." She explained that during an argument occurring during the first few months of her pregnancy, Father put his hand on her throat and pushed her against the window of a car. According to Mother, there "were plenty of other [instances] of pushing, slapping, hitting, threatening to kill [her], multiple things, threatening to kill himself." She further testified that when she was approximately six months pregnant, Father walked into the woods behind their home and "sat by the river with a gun to his head for about two hours[.]" Mother explained that she did not call the police following this incident because she was scared and because she desired that the family remain intact and "work" for the Child after observing the difficulty that Father's older child, Elliott, had experienced with the co-parenting arrangement between Father and his ex-wife. Mother stated that Father told her he had placed a gun to his head because he had hurt a friend and could not forgive himself.

Mother also described an incident happening later in the pregnancy when Father stabbed her in the eye with a paintbrush because they were arguing about painting cabinets. She articulated that Father had admonished that if she did not leave the garage, something "bad would happen." Father then pushed Mother into a trailer, causing her to experience

vaginal bleeding and back problems. Mother stated that she did not contact the police or go to the hospital after this incident because she was afraid.

Mother further testified that although Father drove her to the hospital when she gave birth to the Child, he refused to remain with her there unless she put his name on the Child's birth certificate. Mother shared that she had reservations about doing so based on Father's violence, the fact that they were not married, and her belief that Father would inherently have rights to the Child if he were listed on the birth certificate. However, Mother did eventually place Father's name on the Child's birth certificate.

The relationship between Mother and Father quickly deteriorated further following the Child's birth. Mother reported that roughly one week after the Child was born, her parents moved her and the Child out of the residence she shared with Father upon observing marks and bruises on Mother's face and neck. She then described an incident that had occurred during that first week when she was breastfeeding the Child wherein Father had "slapped [her] in the face so hard he knocked [her] out, and [she] fell down with [the Child]."

The relationship between Father and Mother did not end there, however, and Father's violence toward Mother continued. Mother provided a collective exhibit containing photographs of injuries that she represented were caused by Father during and after her pregnancy with the Child. Mother described physical injuries to her mouth, arm, neck, head, leg, lip, hand, knee, and foot. All of these injuries arose from different incidents of abuse inflicted by Father. Moreover, Mother related that the Child was present for all of the abuse that occurred after the Child's birth. She additionally testified that Elliott was present during an incident when Father slapped Mother's mouth multiple times, injuring her lip. Mother stated that Father told Elliott: "That's what happens when you talk back to Dad." Mother's testimony was that Father never apologized or accepted responsibility for these events of abuse; rather, Mother related that Father "told me I should learn how to be a woman and keep my mouth shut."

Mother testified that she never physically harmed Father, believing that he "would probably kill [her]" if she struck him. Regarding her reasons for remaining with Father, Mother again expressed that she "wanted to make it work" and "make a good life" for the Child without the difficulties of dividing parenting time between co-parents. As such, Mother explained that she also worried about maintaining split custody with Father and the Child being alone with him due to Father's history of abuse of her and the Child.

Mother testified that in March 2020, Father threatened her with a gun and she called the police for the first time because the incident "really scared [her]." Consequently, Father pled guilty to domestic assault in March 2020 and agreed to attend an anger management course as a component of that plea arrangement. According to Mother, the parties

continued to see each other in an attempt to resolve matters. Father subsequently asked Mother to marry him, and she agreed.

Mother described another incident occurring in June 2020 when Father pushed her off the porch in his efforts to leave the home. Mother indicated that she hit her head on the steps as she fell. She contacted the police following this incident, and Father was again charged with assault and arrested. After this arrest, Father transmitted two messages to Mother:

> The cops? Again? If you think for a second I'm going to let you get away with keeping my kid from me you've got another thing coming. I will kill you. You want to throw me in jail? It will be worth it.

> You won't get the restraining order. You will not keep [the Child] from me. I didn't abuse her, I just punished her by biting her back. I can take [the Child] where no one would ever find us. Don't push me. You'll be a childless miserable woman who should have respected me.

An audio recording, which Mother testified contained her voice and Father's, mirrored this message:

Father:     And just like I told (indiscernible) -- if I go to jail, I'm going to deserve it. I'm going to do something to deserve it.

Mother:    Nobody's trying to send you to jail.

Father:     You're not going to threaten me.

When questioned concerning Father's involvement with the Child while the parties were living together, Mother remarked that Father had no morning or bedtime routine with the Child and that he slept on the other side of the home so that he did not hear her cries. Mother explained that aside from spending a brief time playing with the Child when the parties arrived home from work in the evenings, Father endeavored to have little to no involvement with Mother or the Child.

Mother also described physical injuries that Father inflicted upon the Child while the parties were residing together. According to Mother, the Child had been injured at Father's hands "[a]t least six [times] or more. Spankings and popping her in the mouth, pulling her hair, biting her." Mother presented photographic evidence of this abuse. One photo showed bruising on the Child's buttocks, which Mother stated had resulted from a spanking administered by Father. Another photo revealed bruising on the Child's face that Mother noted had appeared a day or two after the Child was left alone with Father while Mother was working. In a third photo, the Child's gums appeared to reveal significant

bleeding, which Mother reported had resulted from the Child being "popped" or "[s]macked" in the mouth by Father. According to Mother, the Child cried for two hours following this incident.[6] Mother testified that Father also pulled the infant Child's hair, spanked the Child multiple times, and drew blood by biting the Child's finger.

According to Mother, Father did not take responsibility for his abusive behavior toward the Child; instead, he considered biting the Child to be "appropriate disciplinary action." Moreover, following the incident when he struck the Child's mouth, Father messaged Mother the following:

> I didn't hit her that hard. That was a light pop on the mouth it was not as bad as you're going to make it out to be. She should not scream at me that way she is acting like a brat like her mom. I've told you and your dad you need to move out. I will sue you for slander and trying to make me look bad with those photos. You keep sticking around though. You have made me be this person towards my kids and made me hate you. I wish your heart condition would kill you already. You're such a f****** b****.

Mother again acknowledged that she was "terrified" that the Child would be taken away from her if the police became involved, and she expressed heightened fear that if something happened to the Child while in Father's custody after the parents separated, she would not "be there to save or protect [the Child] or comfort [the Child] or anything."

The record reflects that Father vacated the home he shared with Mother and the Child in July 2020. Mother related that although she attempted to afford Father supervised visitation with the Child, Father visited only a couple of times. Mother subsequently filed the parentage action in the circuit court in August 2020; however, she noted that she did not continue pursuing the parentage matter because she wanted to avoid the possibility that Father's visitation would increase to where the Child could be left alone with him. Mother acknowledged that she was troubled by the circuit court's March 2022 order establishing that Stepmother would have the opportunity to begin supervising visitation with Father because the Child did not know Stepmother and Mother did not want the visits supervised by an unfamiliar third party.

Mother acknowledged that she did not make significant efforts to ensure that Father could exercise visitation with the Child between September 2020 and March 2022, although she insisted that she had attempted to return telephone calls from SFS employees to no avail. She testified that Father exercised four to six visits with the Child during 2022. According to Mother, more visitation was prevented by COVID-19, other illnesses, and

---

[6] These photos appear to depict an infant or at most, a child of approximately one year of age. It is undisputed that Father only had access to the Child from her birth until she was approximately fifteen months old.

general scheduling difficulties. Mother also referenced tension between herself and the SFS staff that eroded her trust in allowing SFS to continue supervising visitation. Mother described SFS staff as acting in an unprofessional manner. Moreover, according to Mother, the Child would cry and become upset when they arrived at SFS for visits. Mother maintained that the Child would also remain upset for some time after Mother picked her up from these visits.

Mother articulated that Father did not provide her with any support, either financial or in kind, for the Child after he left the parties' shared home in July 2020. She acknowledged that she did not inform Father of a change in address or file an action to establish his child support obligation amount, stressing her belief that contacting him in any way would violate the restraining order. Mother observed, however, that Father and she shared mutual friends who knew where she lived.

According to Mother, she had introduced the Child to Stepfather in December 2020 and Petitioners were married in 2022. When asked about the relationship between Stepfather and the Child, Mother responded: "She absolutely adores him." Mother continued that the Child had called Stepfather "dad" or "daddy" since before Petitioners were married, and Mother stated that the Child did so of her own accord. As noted by Mother, Stepfather's twelve-year-old daughter from a previous marriage, Kamri, resided with Petitioners and the Child a majority of the time. Mother described the girls as "best buddies, attached at the hip." She also articulated that Petitioners and Stepfather's ex-wife enjoyed an amicable relationship and had gotten together with the children regularly.

According to Mother, she and Stepfather had established a routine with the Child and Kamri respecting school, dinner, reading, and bedtime. Mother described the Child as happy and emotionally healthy, but she expressed her apprehension that a change in that routine would be upsetting to the Child. Mother testified that Petitioners had experienced no difficulty taking care of the Child financially and providing for her needs.

Mother described a domestic violence incident that had occurred between herself and Stepfather in early 2022 when a third party contacted the police regarding a heated argument between Petitioners in a gas station parking lot.[7] No children were present. The charges against both Petitioners were later dropped and expunged. Mother testified that as soon as Petitioners left the courthouse, they chose to register for counseling and classes, including anger management, parenting, and finance classes. They remained in counseling until August 2022.

---

[7] Stepfather explained in his testimony that he had grabbed Mother's wrist and she scratched his face, but that this was the extent of the physical component of the argument. Stepfather expressed remorse for the incident and corroborated Mother's explanation, agreeing that the counseling and classes in which they had participated following the incident were beneficial and that no further instances of violence had occurred.

- 9 -

According to Mother, the Child's maternal great-grandmother regularly cared for the Child during the work day while also taking the Child to a church-related program twice a week to interact with other children. The Child's maternal grandmother and grandfather also resided in close proximity to Petitioners and provided care for the Child often. Other members of Mother's family enjoyed regular interaction with the Child as well, including aunts and uncles.

Stepfather's ex-wife and Kamri's mother, Erika D., testified on behalf of Mother, expressing that she and Mother got along well and that she had no reservations about Mother being in the home with Kamri. Erika D. added that Stepfather was designated as primary residential parent for Kamri, with her agreement, and she described him as a "great dad." She included that she, Mother, and Stepfather, along with the Child and Kamri, often enjoyed various activities together, which enabled her to witness the Child's interactions with Stepfather and with Kamri. She opined that Stepfather's relationship with the Child was very loving, as was the relationship between the Child and Kamri.

Stepfather testified that he and Mother shared responsibilities for transporting the Child and Kamri to school or day care. He indicated that he had parents, sisters, and cousins who lived in Florida and that he and Mother would visit them with the children two to three times per year. His family members also sometimes came to visit in Tennessee. Stepfather related that he loved the Child as if she were his own and that Kamri and the Child had always gotten along well and were "best friends." Moreover, he understood the legal implications of his adopting the Child and wished to do so.

The Child's maternal grandmother ("Grandmother") testified that she spent every Monday and Tuesday afternoon with the Child and enjoyed visits with her on the weekends. Grandmother stated that she was close to Mother and loved Stepfather, characterizing the couple as "great with the kids" and explaining that they always sought out family activities. Grandmother offered that she had no concerns regarding Petitioners' parenting of their children.

Grandmother also testified that she had observed bruising on Mother before the Child was born and that she had questioned Mother about it. Furthermore, when Mother experienced back surgery approximately one month after the Child's birth, the Child came to stay with Grandmother rather than being cared for by Father. Grandmother further stated that following the Child's birth, she had to pick up Mother and the Child on three occasions after Father had "kick[ed] them out." On the last such occasion, police officers were there and directed Father to leave. Grandmother described marks and bruising that she had seen on Mother's face and neck that day.

The Child's maternal great-grandmother ("Great-Grandmother") testified that the Child stayed with her on weekdays while Mother was at work. Great-Grandmother included that she often saw Mother, Stepfather, and Kamri as well. Furthermore, she

articulated that Mother and Stepfather were "extremely loving and caring" with the Child and that Kamri and the Child also maintained a very loving relationship.

Great-Grandmother testified that when Mother underwent back surgery, Great-Grandmother was present in Mother's and Father's home and witnessed an argument between them. According to Great-Grandmother, Father had wanted to depart, but Mother asked him not to leave, causing Father to become "very upset." Great-Grandmother reported that Father then "drawed his hand back to slap" Mother. Great-Grandmother was very afraid of Father and had also noticed bruising and "slap marks" on both Mother and the Child during the time that they resided with Father.

The Child's maternal grandfather ("Grandfather") provided testimony that he also had observed physical bruising and injuries on Mother and had confronted Father about them. Although Father denied responsibility for Mother's injuries, Grandfather reported having witnessed Father's hostility, stating that "[Father's] whole demeanor changes when he gets angry." Grandfather later described an incident that occurred in Grandfather's home after the Child's birth when Father "got loud" with Mother and Grandmother and told Grandmother that "she should have raised [Mother] better to obey a man."

During his trial testimony, Father provided a markedly different recounting of his relationship with Mother. Father appeared to question Mother's assertion that she had experienced a miscarriage with her first pregnancy, but he related that when he had moved to North Carolina to follow his ex-wife, Mother had cut off all communication with him. Father explained that he had begun talking to Mother about a year later and they began to date, with Father coming to stay with Mother at her parents' house. After they moved into their shared home but prior to learning of Mother's pregnancy with the Child, Father claimed that Mother "ran [him] off with a gun" over allegations that he was cheating on her, and he returned to his parents' home in Georgia.

Father also related that upon learning that Mother was pregnant with the Child, he eventually returned to the residence he shared with Mother, based on an agreement that they would co-parent the Child. He maintained that they were not in a committed romantic relationship at that time but that Mother became "more and more possessive" such that he felt "compelled into a romantic relationship at every turn," "possessed," and "trapped." Father offered that he was present at the hospital for the Child's birth and denied any argument about his name's placement on the Child's birth certificate. Father stated that he was "very present" during the first months of the Child's life, and he indicated that "[n]ot all of this was bad" and that Mother was a good parent and helped to provide for the Child. Notwithstanding the testimony of Mother and her family members, Father proffered that he cared for Mother during her recovery from back surgery and that he also took care of the Child during that recovery time.

- 11 -

According to Father's testimony, he and Mother only separated a couple of times during the Child's first year, with Mother occasionally spending a few nights at her parents' residence and then leaving twice for a week or so. Father added that these incidents also involved physical confrontations that "escalated when [Mother] felt like she had more proof of whatever she was accusing [Father] of. And then she would put her hands on [Father], especially if [he] tried to walk away from the conversation." Regarding the incident early in Mother's pregnancy when Mother reported that he had pushed her face against a car window, Father insisted that after he denied an accusation that he was unfaithful and attempted to leave the conversation, Mother cut his face, so he "put [his] hand on the side of her face, and [] held her as far as [he] could away and waited for her to calm down[,]" which resulted in several cuts on his arm. Father denied the incident wherein Mother had alleged that he poked Mother in the eye with a paintbrush, asserting instead that "it was an attempt to playfully put paint on her face[.]"

Concerning the March 2020 incident leading to his arrest, Father explained that he was in his vehicle attempting to leave Mother but that she blocked his path with her vehicle before climbing onto the truck, grabbing her own neck, and calling the police. According to Father, Mother picked him up from jail following his release on bond, and they remained in a relationship. Father also stated that Mother discovered him again attempting to leave in June 2020. As he was walking out the door, Mother "put herself between [him] and the doorway, and [he] just kept going. And then she tripped and fell." Father was arrested on that occasion as well. Father recounted that he pled guilty to a lesser charge so that he could get back to work quickly to provide for the family.

Father described another incident wherein he attempted to return to the shared residence to collect some of his possessions, and Mother became upset. She attempted to remove Elliott from the backseat of Father's vehicle and contacted the police. Father indicated that he met the police later at a gas station and explained what had occurred. Father reported that he was not arrested on this occasion.

Father denied ever hitting the Child in the mouth, but he admitted that he would give "maybe a little pop to try to get her attention if she was being hysterical or something," usually on her leg or buttocks. Later in his testimony, however, Father denied ever having spanked the Child. Father described an incident when the Child "was screaming so much . . . inconsolable . . . starting to hyperventilate" and he got "in her face" and "started tapping her cheeks[.]" He denied causing the injury to the Child's mouth shown in the photograph included in Collective Exhibit 3 depicting the Child's bloody gums. Instead, he related that the Child had climbed up on a toy but "fell and hit her mouth on another toy." Father did admit, however, to biting the Child's finger to let her "feel teeth" when she had been biting on his finger. He denied drawing blood. He similarly admitted to pulling the Child's hair to demonstrate that it did not feel good. Father denied ever spanking the Child, stating that the photograph of the Child's red buttocks depicted a diaper rash.

- 12 -

Regarding his entry of a guilty plea concerning the domestic assault charge in March 2020, Father explained that this was the "path of least resistance" so that he could be released on bond and "not have to sit in there for months." Father admitted that he pled guilty to simple domestic assault rather than aggravated and that one of the conditions of the plea agreement was that he would complete an anger management course. Father conceded that he did not complete the anger management course required as part of that judgment. Furthermore, Father denied causing any of the injuries complained of by Mother, stating that he did not even recognize the photographs of injuries to Mother as occurring during their relationship. When records were entered demonstrating that Father was charged with domestic assault again in June 2020, Father claimed that these charges were all the result of Mother "not wanting [Father] to leave the house or the relationship."

Father further denied that he had sent Mother any of the messages that had been entered into evidence, although he admitted that some messages contained statements that he had uttered verbally and were taken out of context. One communication specifically involved his message to Mother that he did not hit the Child in the mouth "that hard"; Father explained that he had actually told Mother verbally that it "was not even a slap; that was a light pop." Father further admitted that it was his voice on the audio informing Mother that if she desired to send him to jail he would do something to deserve it, indicating that a hypothetical person being sent to jail "would want it to be for some reason and not for no reason, which is what these allegations are, no reason."

When questioned as to whether he had contributed to the demise of his relationship with Mother, Father pointed to the fact that he had continued to be married to his ex-wife when the relationship with Mother first began, explaining that "the foundation of the relationship [with Mother] was mistrust . . . you just can't build trust on that." When probed further as to whether there was anything that he wished he had done differently, Father's response was that he "should have left [Mother] earlier . . . before all these allegations came up to prevent [him], in [Mother's] eyes, from seeing [the Child]."

Father acknowledged that he was aware of his obligation to provide financial support for the Child even without a child support order and independent from his ability to visit the Child. Furthermore, Father admitted that he had been working and earning income through his own handyman and construction business for the previous three years or more. Accordingly, Father articulated that he was not advancing the position that he could not afford to pay child support. Father proffered that he had approximately $17,000.00 in "funds set aside" in a bank account to provide for the Child[8] but stated that he did not "trust certain people to handle those funds."[9] Father also explained that after

---

[8] Father did not present proof of the existence of this account or its balance at trial. He explained that the account itself was set up the week before trial although he claimed to have begun setting aside the funds after the first hearing in circuit court.

[9] Father suggested that it "could be inferred" that by "certain people" he meant Mother, and he admitted

- 13 -

Mother filed the paternity action, he was unaware of Mother's address, whereabouts, or bank information. Father stated that he did not know it was possible to provide his counsel with funds to be given to the Child, but he also admitted he did not inquire. Instead, he waited for the parties "to get to a point in court where that could be made clear" to him. Father indicated that he would have no problem depositing the funds into the trial court's registry right away "if it needs to happen."

According to Father, he scheduled his psychological assessment and intake with SFS in October 2020, shortly after these requirements were set out in the circuit court's order. He then completed another intake with SFS following the court's March 2022 order directing Mother to comply with supervised visitation. When asked why he had not pursued legal action to enforce supervised visitation before March 2022, Father reported that it was the responsibility of SFS to communicate with Mother.

Father described his visits with the Child at SFS as going well because the Child did not cry or seem to avoid being in his presence. He stated that he was "quite proud of the job that [Mother] has been doing with raising our daughter. She's social. She's not acting weird." Father contended that he and Mother could find a way to co-parent the Child, clarifying that "all this mudslinging is ridiculous" and that "[i]t's got to stop." Father admitted, however, having conveyed a written message to Erika D., Kamri's mother, approximately two to three months before trial wherein he referred to Mother as "a habitual liar, sociopath, narcissist, and a paranoid schizophrenic."

Stepmother testified that Father and she were married in 2021. She added that her three children from previous relationships lived with them a majority of the time and that Elliott visited during extended holiday weekends and for two months during the summer. She described Father as "calm," "loving," and "affectionate," and related that Father had exhibited no yelling or aggressive behavior during their arguments. Stepmother also testified that Father never acknowledged hurting Mother or the Child, instead insisting that the alleged incidents did not happen or were the result of Father's attempts to protect himself. She included that she believed Father when he informed her that he was not physically violent toward Mother. Stepmother also acknowledged that Father does not tolerate children talking back to him and insists on "yes sir; no sir; yes, not yeah" responses. However, she stated that Father had never been physically violent toward her, her three children, or Elliott.

Father called other character witnesses who testified on his behalf. Father's brother related that although he lived in Georgia, he attempted to see Father approximately once per month or every two months. He maintained that he had viewed Father interacting with

that he did not "really trust the situation to play out the way it needs to." Father further explained that he did not trust Mother to "give credit where it's due" concerning his child support payments and that he knew Petitioners were "not hurting" in terms of their ability to financially support the Child.

- 14 -

Elliott and observed them to be affectionate and to have a good relationship. Father's brother related an incident that had occurred approximately five years prior wherein he became frustrated with his own child and Father demonstrated a calming presence. He explained that following Father's arrest in March 2020, Father had indicated that he had not hurt Mother, claiming instead that she had staged her injuries. Father's brother admitted he did not know of Father's subsequent arrest or the allegations of Father's violence toward the Child.

The Child's paternal grandfather also testified that the allegations of Father's abuse of Mother and the Child were not consistent with his impression of Father, having never known Father to act aggressively or be physically violent. He admitted, however, witnessing an argument between Father and Mother occurring at his home in Georgia. The dispute involved raised voices, cursing, and resulted in him warning them that they would have to leave if they did not stop. Although he was aware that Father had been accused of injuring Mother, he had no previous knowledge of the allegations that Father had caused the Child to bleed by hitting her mouth and biting her finger; he agreed that neither action would have been appropriate.

In addition, a college friend of Father's provided testimony that he had never observed Father lose his temper, stating that Father handled high-pressure situations "exceptionally well." The friend articulated that he was unaware of any occasion when Father had been violent or aggressive against another person, despite knowing that Father had pled guilty to domestic assault in March 2020. The friend added that Father maintained that he had never intentionally harmed Mother or the Child. However, Father's friend also admitted that he had not seen Father in person for approximately six years.

Another long-time friend of Father's testified that he "look[s] up to [Father] and how he interacts with [Elliott]." This friend stated that he had visited with Father and Mother for several weeks during October or November 2018, explaining that, predicated on "a gut feeling[,]" he "was concerned for not only [Father's] safety but for [his own], based on [Father's and Mother's] interactions." He witnessed "a lot of arguing" and yelling by the parties but no physical altercations or injuries.

Andrea Chase, co-founder and co-director of SFS, testified that Father was referred for her to complete an anger management assessment in 2020 through her work as a counselor at a different facility. Ms. Chase reported that after conducting a phone conversation and a virtual meeting with Father, she "did not find that there would be really any benefit to him doing anger management, based upon his provided history and the facts that were given to [her]"; instead, her "biggest concern" during her initial evaluation was that Father was a "victim of domestic abuse." Ms. Chase acknowledged that her opinion at that time was premised solely on facts provided to her by Father. Ms. Chase further noted that Father did not inform her during that initial assessment for anger management

that he had been charged with and pled guilty to domestic assault. She agreed that this information would have been significant.

Respecting the supervised visitation later scheduled to be conducted through SFS, Ms. Chase recounted that Father completed the intake process in October 2020 but that messages to Mother regularly went unanswered until July 2021. Mother then completed the intake process in March 2022. Ms. Chase also reported that although she did not believe that there existed any specific supervision concerns regarding Father, "what appeared to be a very high-conflict situation between the parents elevated the risk" for SFS staff, necessitating implementation of a safety plan. Ms. Chase later admitted that she was not aware that Father had incurred multiple domestic assault charges but suggested that the safety plan would have remained the same if these facts were known.

Ms. Chase further related that supervised visits between Father and the Child occurred at SFS on April 8, April 22, June 24, and July 8, 2022. There were no noted concerns during these visits. According to Ms. Chase, some difficulty with visitation occurred in July and August 2022 when Father brought Stepmother and Elliott to visitation and Mother did not approve. It was Ms. Chase's position that SFS should allow Stepmother to join in visitation because Stepmother would soon become the supervisor of visitation per the circuit court's order. She acknowledged, however, that the circuit court's order neither allowed nor barred Stepmother's attendance during the supervised visits.

On August 4, 2022, Ms. Chase spoke with Mother by phone in an attempt to have Mother bring the Child into the building for the visit. Ms. Chase testified that she "found [Mother] to be very, very irrational and extraordinarily difficult to talk to" during the phone call, such that Ms. Chase became "very, very frustrated." Ms. Chase acknowledged her frustration that certain scheduled visits did not occur, with some of those visits being determined "no call/no show" by Mother, resulting in fees being assessed to Mother that remained unpaid.[10] The interactions between Mother and SFS eventually devolved until attempts to continue visitation ceased.

During cross-examination, Ms. Chase acknowledged that the audio recording of her August 2022 phone conversation with Mother suggested that she was dismissive of Mother's concerns. Ms. Chase explained that she was "really, really annoyed, and [] could not deal with the chaos and everyone sitting around wasting money." Ms. Chase admitted using the word, "ridiculous," and could also be heard laughing when Mother voiced her concerns.

---

[10] Mother presented medical excuse notes that she stated were sent to SFS for certain of these visits. She also presented a call log from her phone indicating multiple calls to SFS that were unanswered. Mother's testimony was that she provided documentation or advanced notice for the majority of the visits she or the Child were unable to attend.

The therapeutic visitation supervisor and co-director of SFS, Blythe Mayfield, testified regarding her supervision of Father's visits with the Child. Ms. Mayfield described the first visit Father had with the Child as successful. Initially, Ms. Mayfield spent time with the Child before bringing the Child into a connecting room where Father was waiting, introducing Father only as her "friend." Eventually, toward the end of the visit, Father joined the Child in playing with a dollhouse, which Ms. Mayfield observed that the Child "was very happy to do[.]" The introduction to Father, still as Ms. Mayfield's friend, occurred more quickly in successive visits, with Father and the Child playing together with the dollhouse again. During some of the later visits, Ms. Mayfield left the room when the Child was comfortably interacting with Father, and she would continue to supervise from a video monitor. Ms. Mayfield noted that Father followed her instructions and appeared for each scheduled visit even when Mother did not. Father was never introduced to the Child as anyone other than "a friend."

When questioned as to whether she had received emails from Mother regarding medical excuses for appointments, Ms. Mayfield responded that she "never saw them" but "[t]hat's not to say that [Mother] didn't send them." Ms. Mayfield explained that she did not always check or open her emails.

Dr. Tom Biller, a licensed clinical psychologist, provided expert testimony regarding his psychological evaluation of Father.[11] He described Father as "a very bright, very intelligent young man" with superior verbal skills, stating that Father's IQ was in the "99th percentile." Dr. Biller opined that Father also seemed "very genuine and very concerned." Dr. Biller stated that the result of Father's initial psychological testing "did show some mild defensiveness, but it indicated no indications of psychopathology." Other tests performed indicated that Father was not a "person that was prone to acting on his anger" or that he had more anger than anyone else. Dr. Biller opined that Father's interactions with children should be "quite positive, quite good." Moreover, Dr. Biller included that it was possible for a person to be in a relationship "so toxic that it changes the entire dynamic for the individual and they would act in a way that they do not usually act."

Dr. Biller testified that he also saw Father during six additional counseling sessions toward the end of 2022 to discuss Father's plans for the future and how he could address his frustration in not seeing the Child. Dr. Biller stated that he did not conduct additional tests upon learning adverse information about Father during his deposition—including Father's arrests for domestic assault—because Father offered explanations of "what he felt had happened, [and] that there were extenuating circumstances that could be brought to light in court and he would be exonerated." Dr. Biller admitted that Father continued to assert that (1) the alleged incidents of violence and abuse did not occur and (2) Father was actually the victim. Consequently, Father offered no apologies for the violence. Dr. Biller

---

[11] The parties stipulated to Dr. Biller's qualification as an expert.

explained that the opinion he offered following the psychological evaluation (that Father should be allowed to visit with the Child) did not change following these additional visits.

Dr. Biller further opined, however, that if "the objective findings of fact do indeed substantiate the allegations [of abuse], then that would change [his] testimony depending upon the reality of what the findings are." Specifically, when presented with the photograph of the Child's bloody mouth and the hypothetical situation that Father was untruthful about having hit the Child and causing the injury, Dr. Biller testified that this would change his opinion and recommendations as "it would indicate that some of [the] things that [he] saw were not accurate, that there is difficulty with impulsive outbursts and anger." When presented with the photograph of the Child's fingers and the hypothetical situation that Father had caused an injury by biting the Child's fingers, Dr. Biller agreed that this would be a matter not to be ignored that would change his recommendation. Similarly, if Mother's allegations of abuse at Father's hands were proven true, Dr. Biller agreed that "[i]t could" cause him to have reservations about the Child being exposed to Father at all.

Dr. Biller continued to note that it is important to maintain a young child's stability and routine while attempting to reintegrate parental visitation because a disruption to such structure and routine can cause the child to exhibit manifestations of emotional or psychological harm. Upon explaining that determining a child's best interest is an especially important decision when the termination of parental rights is contemplated, Dr Biller articulated:

> [Father] did repeatedly indicate that he wants to be a part of his child's life and he wants to be a good, caring parent. And so if that's indeed the case, then, if he did engage in those kinds of things that were alleged, then he's got some work to do to get himself ready in order to be the kind of parent that he envisions himself being.

Dr. Biller explained that therapeutic visitation, when a child meets with a therapist who then manages and supervises the reintroduction of the visiting parent, is more protective of the child than traditional supervised visitation. The process allows the child's therapist to "very carefully control[] and manage[]" the reintegration of the visiting parent. Dr. Biller stated that if the allegations of Father's abuse of the Child and Mother were proven to be true, he would recommend that Father only be allowed therapeutic visitation in a supervised setting. Dr. Biller also stated that he would recommend that Father engage in anger management counseling for "a minimum" of twenty-four hours, explaining that the counseling visits after Father's initial evaluation did not fulfill this twenty-four-hour recommendation. Dr. Biller further opined that he felt it would be difficult for Father and Mother to effectively co-parent given their history.

The trial court entered its written order relative to the termination petition and the motion for contempt on May 9, 2023. The trial court found that there was no dispute concerning the fact that Father had failed to pay any child support during the four-month period preceding the termination petition's filing. The court further found that Father had not asserted an inability to pay, as evinced by Father's testimony that he set $17,000.00 aside for the Child. The trial court rejected Father's argument that he was prevented from providing financial support due to the restraining order prohibiting him from contacting Mother because several other options existed for conveying the support to the Child, such as tendering funds to the circuit court, providing funds to his counsel to send to Mother's counsel, or requesting that SFS employees deliver funds to Mother during visitation. The trial court specifically determined: "Instead, Father willfully failed to support his Child because he 'doesn't trust certain people [*i.e.*, Mother] to handle those funds' and has a 'beef' with Mother. In so doing, Father placed his own personal interests ahead of those of the Child." Thus, the trial court concluded that clear and convincing evidence demonstrated that Father had abandoned the Child by failing to support her and that Father had failed to prove that his failure was not willful.

As to the ground of severe child abuse, the trial court relied on those acts by Father that were undisputed, namely "that Father struck the Child in the mouth, bit the Child's finger, and pulled the Child's hair on at least one occasion." The court found that there was no evidence that this conduct caused the Child any injuries akin to the statutory definition of severe abuse—"serious bodily injury" or long-lasting psychological effects. Therefore, the trial court declined to find that the ground of severe child abuse had been proven by clear and convincing evidence. The court expressly stated, however, that "it in no way condones any physical abuse whatsoever, and finds that Father's conduct was wholly inappropriate in light of the undisputed circumstances."

Having found that a statutory ground for termination had been proven by clear and convincing evidence, the trial court proceeded to analyze the statutory best interest factors, noting that the focus should be on best interest of the Child and not the parents. The trial court entered thorough findings of fact concerning the statutory best interest factors that it found to be applicable. Regarding statutory factor N, which involves consideration of a parent's "physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult," the court specifically found that "Father was 'repeatedly and physically abusive' to Mother, as evidenced by the documents and testimony introduced into evidence." The court likewise found that Father had denied the abuse but that his denial was not credible in light of the corroborative evidence. Furthermore, the court found that Father had physically "disciplined" the Child by "popping" her mouth, biting her finger, and pulling her hair, again determining such behavior to be "wholly inappropriate." The court therefore weighed factor (N) in favor of termination. The court ultimately determined that five factors supported termination, twelve factors weighed against termination, and three factors were neutral or inapplicable.

Following its evaluation of the statutory factors, the trial court concluded:

> There is no question that during his relationship with Mother, Father engaged in conduct toward the Child that, while not rising to the level of "severe abuse" referenced in the statute, is unacceptable. But it is well-established that not all parental conduct is irredeemable, and there exists sufficient countervailing evidence on whether termination would be in the Child's best interests. First, Father has demonstrated an ability to effectively and safely parent, as evidenced by his: (i) undisputedly strong bond with his son, Elliott, who is not the subject of this lawsuit or any other complaints of abuse; and (ii) good relationship with [Stepmother's] three children, who reside in his home. Second, the Court notes that Judge Sharp—after hearing similar proof and finding Father abused Mother and the Child—did not suspend Father's right to see the Child during the pendency of the Bradley County Action. Rather, he afforded Father supervised visitation and suggested he would increase visitation to a transitional schedule in the Child's best interests. Third, the Court places significant weight on the testimony and opinion of Dr. Biller, a qualified clinical psychologist who examined Father and determined he was not a threat to the Child. Even when presented with evidence of Father's past abuse of Mother, Dr. Biller stated he would not change his opinion and would recommend anger management and supervised therapeutic visitation before entertaining termination.

> Therefore, after careful consideration of the testimony and other evidence presented at the Trial, the Court concludes that Petitioners have failed to show by clear and convincing evidence that terminating Father's parental rights is in the Child's best interest going forward.

Finally, the trial court denied Father's motion for criminal contempt, finding that Father had failed to provide specific information concerning the alleged contemptuous conduct. Although Father had averred that Mother was in violation of the circuit court's March 2022 order, the court determined that the only clear directive to Mother contained in that order was that she would complete her intake interview with SFS by March 3, 2022. The court found that Mother had complied with that instruction. Concerning any violation of the circuit court's directive that Father was to exercise supervised visits each week, the court found that Father had failed to prove that Mother willfully violated that provision. The court further noted that although Mother had demonstrated that she transmitted documents to SFS regarding certain visits that she could not attend due to illness and other reasons, Ms. Mayfield had admitted that she had not read Mother's messages or responded.

Petitioners filed a timely notice of appeal on June 6, 2023. Father filed a motion on June 8, 2023, requesting that the trial court accelerate his supervised visitation and allow Stepmother to act as the supervisor. In the alternative, Father requested that the trial court

release jurisdiction over the matter so that the circuit court could enforce its previous orders entered in the parentage action pending the outcome of this appeal.

By order dated July 14, 2023, the trial court concluded that inasmuch as Father was seeking relief in the termination proceeding, which was pending on appeal, and not in the separate parentage proceedings, the court denied Father's motion. However, the court directed the circuit court clerk to "open a new file for the Parentage Action" through which the parties could file pleadings respecting the parentage action.

## II. Issues Presented

Petitioners have presented one issue for this Court's review:

Whether the trial court erred in finding that termination of Father's parental rights was not in the best interest of the Child.

Although Petitioners present this sole issue on appeal, we must also consider whether the trial court erred in finding clear and convincing evidence of abandonment by failure to support as a ground for termination. *See In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) (directing appellate courts to "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal."). Because the trial court found that the statutory ground of severe child abuse was not supported by clear and convincing evidence, we are not required to review that ground. *See In re Disnie P.*, No. E2022-00662-COA-R3-PT, 2023 WL 2396557, at *5 (Tenn. Ct. App. Mar. 8, 2023) (noting that there is no requirement "to review grounds for termination that the trial court deemed inapplicable unless the petitioner challenges those rulings.").

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d at 523-24; *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Statutory Ground of Abandonment by Failure to Support

Tennessee Code Annotated § 36-1-113 (West July 1, 2021, to July 1, 2022) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

\* \* \*

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

In its final judgment, the trial court found that clear and convincing evidence supported one statutory ground for termination: abandonment by failure to financially support the Child.

Tennessee Code Annotated § 36-1-113(g)(1) (West July 1, 2021, to July 1, 2022) provides as relevant to this ground:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

- 23 -

(1)    Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

The version of Tennessee Code Annotated § 36-1-102(1)(A) (West July 1, 2021, to July 1, 2022) in effect when the termination petition was filed provided the following definition of abandonment as pertinent here:[12]

> For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> (i)    For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

A parent may raise as an affirmative defense that the failure to provide financial support was not willful. Tenn. Code Ann. § 36-1-102(1)(I). In order to rely on this affirmative defense, the parent must prove the absence of willfulness by a preponderance of the evidence. *Id.* Willfulness in terms of grounds for termination of parental rights "does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005) (internal citations omitted). As the *Audrey* Court explained:

> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to

---

[12] Throughout this Opinion, unless otherwise noted, all statutory citations shall be made in reference to the version that was effective at the time the amended termination petition was filed on May 2, 2022. *See In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *4 (Tenn. Ct. App. Aug. 15, 2023); *see also In re Leah T.*, No. M2022-00839-COA-R3-PT, 2023 WL 4131460, at *13 (Tenn. Ct. App. June 22, 2023) (explaining that "when additional statutory grounds in support of termination were raised in an amended petition, the amended petition had to be considered separate and distinct from the original petition for the purpose of establishing its filing date, such that the amended statutory best interest factors that had taken effect by the time of the amended petition's filing would be applicable."). In some instances, the subsection that was in effect at the time of the amended petition's filing has not changed and therefore remains current.

- 24 -

visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child.

*Id.* at 864 (citations and footnotes omitted).

Here, there is no dispute that Father failed to provide any support for the Child, either financially or in kind, at any point after approximately August 2020.[13] In his answer to the amended complaint, Father raised the affirmative defense of lack of willfulness. During the termination hearing, Father did not claim that he was financially unable to pay support. Instead, he blamed his failure to financially support the Child on (a) a lack of directive from the trial court explaining how to get the support to the Child and (2) his lack of knowledge of Mother's address. These factors, however, do not establish that Father was "actually prevent[ed]" from performing his obligation. *In re Audrey S.*, 182 S.W.3d at 864. Moreover, Father admitted during trial that he did not trust Mother to receive the funds and "give [him] credit" appropriately. Father also admitted that he had not sought any alternative means of providing support to the Child and had believed that Petitioners were able to support the Child without his help. Thus, we agree with the trial court that Father's failure to support the child was willful.

Father testified that he had approximately $17,000.00 set aside for the Child and that he was prepared to deposit the funds into the trial court's registry immediately. However, the statute is clear that "[a]bandonment may not be repented of by resuming . . . support subsequent to the filing" of a termination petition. Tenn. Code Ann. § 36-1-102(1)(F). We therefore conclude that the evidence preponderates in favor of the trial court's determination that the statutory ground of abandonment by failure to support was proven by clear and convincing evidence.

## V. Best Interest of the Child

When, as here, a parent has been deemed unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is

---

[13] Although the trial court did not specifically identify the dates of the applicable determinative period of four months preceding the petition's filing, we determine such error to be harmless because the court "made sufficient findings of fact that encompassed the correct determinative period." *See In re Elijah F.*, No. M2022-00191-COA-R3-PT, 2022 WL 16859543, at *5 (Tenn. Ct. App. Nov. 10, 2022). We note that in this case, the relevant four-month statutory period for determining whether abandonment occurred would be January 2, 2022, to May 1, 2022. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the applicable four-month statutory period preceding filing of the termination petition ends on the day preceding filing).

- 25 -

separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i)(1) (West July 1, 2021, to July 1, 2022) lists the following factors for consideration:

(A)     The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)     Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)     Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)     Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)     Whether the child is fearful of living in the parent's home;

(G)     Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)     Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statute further provides: "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(g)(i)(2).

As our Supreme Court has instructed regarding the best interest analysis:

When conducting the best interests analysis, courts must consider [the] statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each

statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In its final judgment, the trial court thoroughly analyzed all of the statutory factors; notably, the court placed particular emphasis on the expert testimony of Dr. Biller when weighing those factors. While expressly finding that Father had been violent and abusive with Mother and had also engaged in "unacceptable" conduct toward the Child, the court characterized Father's behavior toward Mother as "inconsistent" with the way Father engaged with others outside that "toxic" relationship (a point made by Dr. Biller). The court concluded that Father's violent tendencies toward Mother and the Child were outweighed by countervailing evidence concerning his effective parenting of Stepmother's children and Elliott, as well as Dr. Biller's expert testimony that Father "was not a threat to the Child." Upon our thorough review of the best interest factors and factually intensive analysis of the evidence, we respectfully disagree.

Clearly, this appeal focuses upon a case involving parties whose testimony is diametrically opposed. By Mother's account, Father is an unstable, violent man who is a danger to both Mother and the Child. Mother's testimony has considerable corroboration in the record, including text messages, photographs, audio recordings, court records evincing Father's arrests, and Father's domestic assault guilty plea. Moreover, both the circuit court and the trial court concluded that the evidence established that Father had inflicted repeated violence upon Mother. Both courts further determined that Father's behavior toward the Child, who only had significant contact with Father from birth to approximately fifteen months of age, was at best "wholly inappropriate."[14]

---

[14] Regarding the incidents when Father "popped" the Child in the mouth, bit the Child's finger, and pulled the Child's hair, the trial court stated: "The fact that Father considers these acts 'disciplinary' instead of 'abusive' is inconsequential to the Court. Rather, the Court finds this treatment of the Child to be wholly inappropriate." The circuit court found that Father had been "physically and repeatedly abusive" to the Child and had caused substantial and irreparable harm to her.

- 29 -

By contrast, Father continually denied any responsibility for Mother's injuries, claiming that Mother "staged" her multiple, significant bruises and other wounds. The trial court found Father's testimony in this regard to be non-credible, and we afford great weight to that determination. *See Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) ("When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000))). Father also propounded that Mother had exaggerated his abuse of the Child, claiming that his actions were instead a form of warranted discipline. Furthermore, despite the incontrovertible evidence of Father's extreme threats toward Mother, he appeared to exhibit no remorse and assumed no responsibility for those actions.

Turning to the statutory best interest factors, we determine that several factors weigh heavily in favor of termination of Father's parental rights. Most concerning, of course, is the violence exhibited by Father during his relationship with Mother. *See* Tenn. Code Ann. § 36-1-113(i)(N) (involving brutality, abuse, or neglect by the parent against any child or adult). As previously stated, both the circuit court and the trial court determined that Father had repeatedly abused Mother, and we agree with such finding. As the trial court expressly stated:

> [T]he preponderance of the evidence reflects that Father has physically abused Mother in the past. Specifically, the Court finds (as Judge Sharp did) that Father was "repeatedly and physically abusive" to Mother, as evidenced by the documents and testimony introduced into evidence. Father denies any role whatsoever in causing these injuries, and takes no responsibility for anything that transpired between him and Mother other than suggesting he should have left her earlier than he did. Father's denial of abuse is not credible at all, for several reasons. For example, it ignores other evidence corroborative of physical abuse, such as the audio recording threatening to put a bullet in Mother's brain and the threatening text messages sent from his mobile device and social media account. Further, Father's suggestion that he did not even *know* about some of the injuries is implausible given: (i) he shared a home with Mother; and (ii) other individuals in Mother's life (*e.g.*, her family members) testified that they noticed bruising sufficient enough to cause them to remove her from the home on more than one occasion.

We reiterate that the trial court's determinations regarding witness credibility are entitled to great weight on appeal. *See Kelly*, 445 S.W.3d at 692; *Jones*, 92 S.W.3d at 838.

Another point of significant concern is Father's continued failure to accept any responsibility for the violent nature of the parents' relationship. Like both the circuit court

and the trial court, we discern Father's denial of his violence during the relationship, and especially Father's postulate that he did not even know of the injuries depicted in Mother's photographs, to be wholly non-credible. Moreover, Father's testimony that he did not send Mother the abusive messages contained in the record seems particularly disingenuous when set against the backdrop of his admission during trial that it was his voice telling Mother that he intended to "earn" being sent to jail in the audio recording, a sentiment echoed in a July 2020 text message.

In addition, relating to the same factor, we determine it extremely concerning that Father demonstrated no recognition of the inappropriate nature of the "discipline" he inflicted upon such a young child. Even when considering solely the actions that Father acknowledged—"popping" the Child's mouth, biting her finger, and pulling her hair— Father ostensibly had no appreciation for the fact that such actions were "wholly inappropriate" and unacceptable as a method of disciplining an infant. Father's failure to recognize the inappropriate nature of these actions amounts to a failure to take responsibility or express remorse for them.

This Court has previously held that a party's unwillingness to assume responsibility for his or her past actions can be a significant barrier toward lasting change. *See In re Brandon H.*, No. E2020-00713-COA-R3-PT, 2021 WL 321383, at *7 (Tenn. Ct. App. Feb. 1, 2021) (concluding that "[the father's] refusal to acknowledge his actions and the effect of those actions on the Child demonstrates: (1) Father's disregard for the Child's safety and wellbeing; and (2) Father's unwillingness to change his harmful behaviors. Accordingly, it is neither safe nor in the Child's best interest to return to Father."); *In re Collwynn J.*, No. E2020-00726-COA-R3-PT, 2020 WL 7319549, at *5 (Tenn. Ct. App. Dec. 11, 2020) (noting that the parent's "struggle to acknowledge the conditions that necessitated removal of the Child to begin with" "inspires little confidence that these conditions can be remedied at all"). Here, Father's past violence toward Mother (both during her pregnancy and later in the Child's presence), his abusive and inappropriate discipline of the Child, and his refusal to take responsibility for such behavior and how that behavior would impact the Child are paramount considerations that are most concerning. We therefore discern that these factors prove as a barrier toward the type of lasting change required by Tennessee Code Annotated § 36-1-113(i)(J) (involving the parent's lasting adjustment of circumstances).

Father's refusal to recognize his role in the past abuse also gives us pause respecting Father's mental and emotional fitness to parent. *See* Tenn. Code Ann. § 36-1-113(i)(T) (involving the parent's mental and emotional fitness to effectively care for the child). With respect to this factor, the trial court placed great emphasis on Dr. Biller's opinion that Father was mentally and emotionally fit to parent. However, the proof is clear that Father omitted key facts when discussing his situation with Dr. Biller. Dr. Biller testified at trial that Father never admitted to having been abusive with Mother and instead advanced that she had lied about or staged her injuries, or that he was actually the victim of her

- 31 -

aggression. Dr. Biller was similarly unaware of Father's inappropriate treatment of the Child during her infancy.

As Dr. Biller explained, if the abusive behavior were proven, as the trial court found that it had been, Father would have "some work to do to get himself ready" to be the parent that he wished to be for the Child, including undergoing anger management training and engaging in therapeutic, supervised visitation. However, the record contains no evidence that Father initiated steps to improve his parenting or accomplished the "work" suggested by Dr. Biller.

Moreover, given Father's refusal to assume responsibility for his past actions during the years leading to trial, we determine that it is unlikely that Father would be willing to accept responsibility for his abusive behavior and to endeavor the measures necessary to comply with the changes suggested by Dr. Biller. In addition, Father failed to attend any anger management training, despite his agreement to do so in his domestic assault guilty plea, relying on Ms. Chase's opinion that such training was unnecessary (based on facts provided solely by Father). *See* Tenn. Code Ann. § 36-1-113(i)(K) (considering the parent's willingness to take advantage of available programs to assist in making a lasting adjustment of circumstances, conduct, or conditions). Accordingly, we conclude that factors (J), (K), (N), and (T) weigh heavily in favor of termination in the case at bar.

Similarly, upon careful review, we are less inclined than the trial court was to conclude that Father acted with urgency in this case. *See* Tenn. Code Ann. § 36-1-113(i)(M) (involving the parent's sense of urgency). Although proof was presented suggesting that Mother may have acted with some reluctance toward Father's ability to engage in supervised visits with the Child as provided in the circuit court's order, and Father eventually sought court intervention in the midst of Mother's behavior, we note that there existed an eighteen-month gap between the circuit court's initial order allowing supervised visitation and Father's efforts to enforce that order, which gap is not fully explained in the record. Moreover, Father neither instituted the parentage action nor sought any relief from the courts concerning visitation prior to Mother's filing of the circuit court action. These facts also impact factor (E) concerning whether Father maintained regular visitation or used the visitation to cultivate a relationship with the Child, as well as factor (B) concerning the effect that a change of caretakers would likely have on the Child's emotional and psychological condition. *See* Tenn. Code Ann. § 36-1-113(i)(E), (B).

By the time of trial, Father had only visited with the Child approximately four times in almost three years. The Child was only four years of age. Although the parties' positions are divergent concerning the cause of this lack of contact,[15] the circumstance remains that

---

[15] Although the trial court seemed to assign responsibility for Father's lack of visitation to Mother to some extent, despite Mother's testimony regarding unanswered calls to SFS and unopened emails containing medical excuses, we note that the trial court also did not find Mother in contempt for any alleged violation

the Child did not know Father at all upon commencement of trial—in fact, she believed Stepfather to be her father and was introduced to Father during visits only as Ms. Mayfield's "friend." As Father acknowledged, introducing him as a father to the Child would be a "shock." Furthermore, Father admitted that he had no current parental bond with the Child, and we conclude that his ability to form such an attachment would potentially be hindered by his inappropriate approach concerning discipline and his lack of introspection and urgency regarding his parenting. *See* Tenn. Code Ann. § 36-1-113(i)(D). Accordingly, these factors also weigh in favor of termination.

As the trial court found, other factors weigh in favor of termination as well. For example, Father demonstrated a lack of concern for and a failure to consistently meet the Child's needs. Father had admittedly failed to provide any financial support for the Child since approximately August 2020, and the trial court determined this lack of support to be willful and predicated on Father's "beef" with Mother. *See* Tenn. Code Ann. § 36-1-113(i)(C) (involving the parent's continuity in meeting the child's needs), (S) (involving the provision of financial support). It is also clear that the Child had formed a meaningful parent-child relationship with Stepfather and that the stability of the Child's life and routine would be affected by a reintroduction to the understanding of Father as her parent. *See* Tenn. Code Ann. § 36-1-113(i)(A) (involving the effect of termination on the child's need for stability), (H) (involving the child's attachment to another parent-figure).

We agree with the trial court that certain factors—namely factors (F), (G), (O), (P), (Q), and (R)—weigh against termination in this matter, and that other factors, such as (I) and (L), are inapplicable or weigh neutrally. Although a majority of the factors weigh in favor of termination by our analysis, the inquiry does not involve simply tallying those factors that weigh for or against termination. Instead, we must consider the weight to be afforded each of the factors. *See In re Gabriella D.*, 531 S.W.3d at 681-82; *see also In re Jonah B.*, No. E2022-01701-COA-R3-PT, 2023 WL 8439925, at *9 (Tenn. Ct. App. Dec. 5, 2023) (determining that two of the factors weighed heavily in favor of termination even though a numerical majority of the statutory factors did not). We reiterate and emphasize that the best interest factors must be viewed from the best interest of the Child and that depending on the facts presented, "the consideration of one factor may very well dictate the outcome of the analysis." *In re Gabriella D.*, 531 S.W.3d at 681-82 (quoting *In re Audrey S.*, 182 S.W.3d at 878).

In *Gabriella D.*, the trial court had determined that the subject child's best interest would not be served by terminating the mother's parental rights, and this Court had reversed that decision and granted termination. *See In re Gabriella D.*, 531 S.W.3d at 681-82. Our Supreme Court disagreed, concluding that the mother had shown significant improvement in her circumstances and conduct because:

---

of the circuit court's visitation order.

She has separated herself from a person who was long an abusive and toxic influence in her life. She has cooperated with DCS and completed all the tasks the permanency plan required of her. She has obtained treatment for a longstanding drug addiction and has remained drug free, as drug screens have demonstrated, for years after completing treatment. She has reestablished relationships with her children and built a strong family support system for herself and the children. The children have thrived in Mother's care and wish to remain with Mother. The expert witnesses and DCS witnesses opined that removing the children from Mother would not be in their best interests. The Juvenile Court opined that the children should remain with Mother. Considering the record as a whole, we conclude that the trial court correctly held that the combined weight of the proof does not amount to clear and convincing evidence that termination is in the best interests of the children.

*Id.* at 686.

Unlike the mother in *Gabriella D.*, who had embraced responsibility for her issues, diligently worked her permanency plan, and met all requirements to have her custody reinstated, *see id.*, Father has maintained a position of denial, attempted to shift blame, offered excuses, and refused to accept responsibility for his behavior. Ergo, we find this case distinguishable from *Gabriella D.*[16]

Based upon our *de novo* review of the facts presented, *see id.* at 680, we cannot concur with the trial court's conclusion that denying the petition for termination of Father's parental rights was in the Child's best interest. Particularly troubling is the documented threatening, violent, and abusive behavior exhibited by Father, as well as his refusal to accept any responsibility for such behavior. Despite the fact that Father was found to have repeatedly abused Mother by two trial courts, Father continued to deny such behavior to the courts, Dr. Biller, Ms. Chase, and witnesses who testified on his behalf. Mother's bruises and other injuries were recorded in photographic evidence and corroborated by her family, who witnessed same in real time during the parties' relationship. Moreover, Father was arrested for such abuse and pled guilty on at least one occasion to domestic assault. Both the circuit court and the trial court found Father's denial of his abusive behavior to be non-credible by reason of the corroborating photographs, written messages, and audio recordings.

Of equal import is Father's "inappropriate" treatment of the Child while she was in his care. As the trial court noted, Father admitted to "popping [the Child] in the mouth to

---

[16] We emphasize that we do not base this determination solely on the existence of evidence concerning Father's abusive behavior. As previously stated, multiple factors favor termination of Father's parental rights, and we conclude that the combined weight of those factors is greater than the weight of the factors disfavoring termination.

- 34 -

get her attention," "biting the Child's finger to 'let her feel my teeth,'" and "pulling the Child's hair to incentivize her to abstain from doing it to others." Although this behavior was not determined to constitute "severe" child abuse as it is defined in the respective statute, it is abusive behavior nonetheless. Again, Father expressed no remorse for such behavior and took no measures to ensure that it would not be repeated in the future.

Had Father expressed remorse or concern for his past actions or undertaken any efforts to attend anger management training or other professional services to address his behavior/issues, he may have been able to demonstrate that adjustment of his circumstances was possible, as did the mother in *Gabriella D*. *See In re Gabriella D.*, 531 S.W.3d at 686. Although Father consulted Dr. Biller for a few follow-up sessions after his evaluation, Dr. Biller's testimony at trial demonstrated that Father had never accepted his role in the abuse of Mother or the Child during counseling and continued to deny any violent behavior on his part. Dr. Biller also acknowledged during his deposition that he had not received information regarding the allegations made against Father in circuit court before he formed his opinion. Moreover, Dr. Biller admitted that proof of such violent behavior by Father would negate some of the findings from the psychological testing and would demonstrate that Father's answers given on the tests were inaccurate. Dr. Biller also noted that Father's high intelligence would better enable Father to manipulate his answers on the objective tests.

The trial court placed great emphasis on Dr. Biller's opinions, but we determine Dr. Biller's acknowledgement that he was not presented with all the facts concerning Father's abuse of Mother and the Child to be significant. Dr. Biller's own testimony demonstrates that his opinions were somewhat skewed because of Father's failure to self-report all of the facts surrounding his relationship with Mother and the Child. Although we neither determine that Dr. Biller's testimony should have been disallowed by the trial court nor that it lacked credibility, we respectfully conclude that his testimony should not have been afforded the weight assigned by the trial court due to Dr. Biller's lack of knowledge regarding the full constellation of facts concerning Father's past behavior. *See, e.g., In re I.R.J.*, No. M2009-00411-COA-R3-PT, 2009 WL 4017168, at *14 (Tenn. Ct. App. Nov. 18, 2009) (recognizing that a psychological expert's opinion can be afforded less weight when the expert relies solely on the subject's self-reporting of facts and consults no collateral sources of information); Tenn. R. Evid. 703.

Having thoroughly reviewed the evidence presented in relation to the statutory factors, we conclude that clear and convincing evidence militates in favor of the termination of Father's parental rights as being in the Child's best interest. Having also determined that Petitioners had proven the existence of a statutory ground for termination by clear and convincing evidence, we accordingly conclude that Father's parental rights to the Child should be terminated.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's determination that the statutory ground of abandonment was proven by clear and convincing evidence. However, we reverse the trial court's ultimate determination regarding termination and conclude that termination of Father's parental rights is in the Child's best interest. We therefore remand this matter to the trial court for entry of an order terminating Father's parental rights to the Child and for any further actions necessary and consistent with this Opinion. Costs of this appeal are taxed to the appellee, Thomas C.

s/Thomas R. Frierson, II

_____

THOMAS R. FRIERSON, II, JUDGE